788 So.2d 660 (2001)
STATE of Louisiana
v.
Eddie CHRISTOFF.
No. 00-KA-1823.
Court of Appeal of Louisiana, Fifth Circuit.
May 30, 2001.
*661 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Cameron Mary, Assistant District Attorneys, Gretna, LA, Attorneys for Plaintiff/Appellee.
*662 Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, Attorney for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
GOTHARD, Judge.
Defendant, Eddie Christoff, and co-defendant, Giovanni Brown, were indicted by a grand jury on December 16, 1999 on one count of aggravated kidnapping and four counts of armed robbery occurring on October 27, 1999 in violation of LSA-R.S. 14:44 and 14:64 respectively. Both pled not guilty and proceeded to separate trials.[1]
Numerous pre-trial motions were filed including a motion to quash the indictment and motions to suppress defendant's identification, his statement and evidence seized pursuant to several different search warrants, all which were denied by the trial court. Defendant proceeded to trial on May 22, 2000. After a three-day trial, the jury unanimously found defendant guilty of the responsive verdict of second degree kidnapping and guilty as charged on all four counts of armed robbery. Defendant filed a Motion for New Trial which was denied.
Defendant was subsequently sentenced to five years on the second degree kidnapping conviction and ten years on each of the four armed robbery convictions. All sentences were imposed without benefit of parole, probation or suspension of sentence and were ordered to run consecutively. Defendant now appeals his convictions and sentences.

FACTS
Between 5:30 p.m. and 6:00 p.m. on October 27, 1999, William Boada, Jr. ("Bill Jr."), age 17, was outside his home on Lake Lynn Drive in Harvey washing his father's black BMW when he was approached by defendant Christoff, and co-defendant, Brown. Brown asked Bill Jr. if he wanted to buy a phone card to support defendant's school. At this point, defendant was standing behind Brown. When Bill Jr. declined, Brown asked for a pen. Bill Jr. could not find a pen in the car so he went inside the house. As he entered his house, Brown put a gun to his back.
Once inside, the perpetrators took the phone off the hook and instructed Bill Jr. to lie on the ground. Brown demanded to know whether anyone else was in the house. Bill Jr. informed defendant that his younger brother, Brian, was taking a shower. Brown went looking for Brian while defendant stood over Bill Jr. with a gun. Brown was unable to find Brian and returned, insisting to know Brian's whereabouts. Defendant put a gun to Bill Jr.'s back and forced him to lead the perpetrators to Brian's location. Bill Jr. was forced to persuade his brother to come out of the locked bathroom. In the interim, both perpetrators made several unsuccessful attempts to kick down the bathroom door. When Brian came out, the perpetrators pointed their guns at his face.
The perpetrators brought Bill Jr. and Brian to the living room, and asked various questions about the location of the money in the house and when their father, William Boada, Sr. ("Mr. Boada"), would be home. The victims were then taken at gunpoint to an upstairs bedroom and told to strip to their underwear. Both victims were bound with duct tape from their *663 wrists to their elbows, from their ankles to their knees and around the head and mouth. A small hole was cut in the duct tape over the victims' mouths. The victims were then dragged to the bathroom and left lying on their sides. Although the bathroom door was closed, Bill Jr. and Brian could hear defendant and Brown rummaging through the house.
At approximately 7:30 p.m., Amanda King, Bill Jr.'s girlfriend, age 19, came to the house which she often did after her classes at Delgado. She knocked on the door and rang the doorbell, but there was no response. She saw shadows on the upstairs wall and knew someone was home. Amanda called the house from a pay phone, but got a busy signal. She returned to the house and rang the doorbell again, but there was no answer. She left again and went to the health club, owned by Mr. Boada, in search of Bill Jr. She saw Mr. Boada at the club and concluded Bill Jr. was the person at home. Amanda returned to the house and again rang the doorbell. She peered through the front glass door and saw one of the perpetrators walking down the stairs. The perpetrator came to the door, pointed a gun at her and ordered her inside. She was taken to the kitchen at which time she saw a second armed man.
Immediately thereafter, Mr. Boada came home and was met by defendant and Brown. The perpetrators pointed their guns at Mr. Boada and told him they had been waiting for him. The perpetrators stated that they did not want to hurt anyone, but they would if Mr. Boada did anything "stupid." While holding Mr. Boada at gunpoint, the perpetrators demanded money. Mr. Boada explained there was no large sum of money in the house. The perpetrators then inquired about a safe box they found upstairs, but Mr. Boada stated there was nothing in it but papers. Mr. Boada was forced to open the box to show that it did not contain any money. Mr. Boada was asked about his ATM card. It was determined that Mr. Boada would go with Brown to an ATM machine and withdraw money. However, prior to leaving, Mr. Boada insisted on seeing his children.
During the discussion between Brown and Mr. Boada, defendant brought Amanda upstairs. Amanda was ordered to take her clothes off but she refused. Defendant bound Amanda in the same manner as Bill Jr. and Brian, and placed her in the bathroom with the other victims. Subsequently, Mr. Boada was brought into the bathroom to see Bill Jr. and Brian who were bound with duct tape and visibly frightened.
Thereafter, Brown forced Mr. Boada at gunpoint to drive Amanda's car, a gold Malibu, to the bank. Prior to the departure, defendant threatened that if they did not return, he would hurt the remaining victims. Defendant held the three teenagers captive while Brown and Mr. Boada went to the ATM. During this time, defendant rummaged through the bedroom.
Once at the bank, Mr. Boada discovered he did not have his ATM card. Brown became angry and immediately decided they would return to the house. Upon returning to the house, Mr. Boada was also bound with duct tape and placed in the bathroom with the other victims. However, unlike the other victims, Mr. Boada's mouth was not taped. Defendant and Brown continued to ransack the house, periodically checking on the victims. At one point, Brown told the victims he would let them know when he and defendant were leaving. The victims believed Brown's statement meant he and defendant were going to kill them before they left. The victims all thought they were going to die.
*664 Some time passed and the house became quiet. After concluding that defendant and Brown had left, the victims untied each other. By this time, Bill Jr.'s hands were swollen and numb from lack of circulation, and he was having difficulty breathing. Mr. Boada grabbed his gun from the night stand in his bedroom and all the victims went to the neighbor's house where they called the police.
Detective Damon Johnson arrived on the scene around 9:30 p.m. and was the first police officer to arrive. He noted the house was disorderly and looked like it had been ransacked. During the investigation, it was determined that various items had been taken from the house including clothes, shoes, two watches, telephones, VCR, TV, a stereo, computer, and various other electronic equipment. In addition, Mr. Boada's black BMW and Amanda's gold Malibu had been taken. The investigators took photographs and lifted fingerprints from the scene. The victims gave a description of the perpetrators as well as the name, "Divante," which they heard defendant call Brown.
While the police were still at Mr. Boada's house, they received a broadcast regarding the pursuit of a black BMW which was being driven by a person matching the description of one of the perpetrators. However, the driver fled after hitting another vehicle and was not apprehended. Fingerprints taken from the BMW yielded no useable prints.
Approximately three to four days after the incident, Amanda's gold Malibu was found in the river in New Orleans. Inside the car, items belonging to Amanda and Mr. Boada were found. No readable fingerprints were obtained.
Thereafter, Detective John Duzac from the New Orleans police department received information from a confidential informant that two young black men were bragging about committing the Stone-bridge robbery. Detective Duzac was given the names "Mike Flagstaff," who was later determined to be defendant, and "Giavante." On November 12, 1999, investigators obtained a search warrant for defendant's last known place of residence. In addition, Detective Durell Pellegrin prepared a photo lineup containing defendant and showed it to the victims. Bill Jr. and Brian made immediate positive identifications of defendant while Mr. Boada made a tentative identification and Amanda made no identification. After the identifications, Detective Pellegrin obtained an arrest warrant for defendant. Thereafter, the search warrant was executed. Defendant was located within the residence and immediately arrested. At the time of his arrest, defendant was wearing a Fossil watch stolen from the Boada home. A search of the residence revealed the CD player taken from Amanda's vehicle.
Defendant testified in his own defense. He stated that he did not know what Brown planned to do and he merely went along with Brown because he feared for his own safety.
Defense counsel has filed a brief pursuant to the procedure approved by the United States Supreme Court in Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), reh'g denied, 388 U.S. 924, 87 S.Ct. 2094, 18 L.Ed.2d 1377 (1967), discussed in State v. Benjamin, 573 So.2d 528 (La.App. 4 Cir.1990), approved by State v. Mouton, 95-0981 (La.4/28/95), 653 So.2d 1176, and adopted by this Court in State v. Bradford, 95-929, 95-930 (La.App. 5 Cir. 6/25/96), 676 So.2d 1108. In particular, counsel asserts he cannot find any non-frivolous issues to raise on appeal and seeks to withdraw as defense counsel. In his brief, defense counsel addresses and dismisses as possible issues, the sufficiency of evidence, the failure of the trial court to *665 include false imprisonment as a responsive verdict, and excessiveness of sentence. Neither defense counsel nor the State note any errors patent.
In accordance with State v. Bradford, supra, this Court sent defendant a certified letter advising him that his appellate counsel found no non-frivolous issues for appeal and gave defendant the opportunity to file a supplemental brief. Defendant timely filed a pro se supplemental brief raising two assignments of error which are discussed below.
In State v. Jyles, 96-2669 (La.12/12/97), 704 So.2d 241, 242, the Louisiana Supreme Court revisited the Anders procedures outlined in State v. Benjamin, supra, and adopted by this Court in State v. Bradford, supra, and stated that the brief filed by defense counsel "must review not only the procedural history of the case and the evidence presented at trial but must also provide ... a detailed and reviewable assessment for both the defendant and the appellate court of whether the appeal is worth pursuing in the first place." Defense counsel is required to "cast an advocate's eye over the trial record and consider whether any ruling made by the trial court, subject to the contemporaneous objection rule, had a significant, adverse impact on shaping the evidence presented to the jury for its consideration." Jyles, supra at 242.
Because we find defense counsel's brief to be in compliance with the above cited law, we grant the motion to withdraw as counsel.

ANALYSIS
In his pro se brief to this court, defendant assigns two errors which relate to sentencing. In the first assignment, defendant argues the trial court erroneously relied on a version of the armed robbery statute not in effect at the time of the offense. Specifically, defendant asserts the trial court was under the erroneous assumption that the minimum sentence for armed robbery was ten years.[2] Defendant maintains at the time of the offense, in October 1999, the minimum sentence under LSA-R.S. 14:64 was five years.
Defendant's argument has no merit. Currently, the sentencing range for armed robbery is between ten and ninety-nine years. LSA-R.S. 14:64(B). In 1999, the Legislature amended LSA-R.S. 14:64(B) to increase the minimum sentence for armed robbery from five to ten years. 1999 Acts No. 932 § 1. The amendment became effective on July 9, 1999. Defendant committed his crimes on October 27, 1999, 3½ months after the increase in the minimum sentence amendment became effective. Defendant's minimum ten year sentence on each armed robbery conviction is consistent with the statute in effect at the time of the commission of the crime.
In his second assignment, defendant argues that the consecutive nature of his sentences is excessive. In addition, he asserts the trial court erred in failing to comply with LSA-C.Cr.P. art. 894.1 because it did not articulate the factors it took into consideration in imposing the sentences.
First, it is noted that defendant did not file a written Motion to Reconsider Sentence at the trial court level pursuant to LSA-C.Cr.P. art. 881.1.[3] While defendant *666 made an oral objection at the time of sentencing, the objection was not specific enough to satisfy the requirements of LSA-C.Cr.P. art. 881.1. Defense counsel merely states, "Your Honor, please note our objection to the sentence." Defendant never specifically objected to the consecutive nature of the sentence or to the trial court's failure to comply with LSA-C.Cr.P. art. 894.1. The failure to file a written motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness. State v. Hester, 99-426 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied in State v. Patterson, 99-3217 (La.4/20/00), 760 So.2d 342.
The issue of the excessiveness of a consecutive sentence is not included in a bare constitutional review. State v. Hester, supra at 103. Thus, this Court's review is limited to the constitutional excessiveness of each of defendant's sentences.
A sentence is constitutionally excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or is nothing more than the needless and purposeless imposition of pain and suffering. State v. Robicheaux, 412 So.2d 1313 (La.1982). Trial judges are granted great discretion in imposing sentences, and sentences will not be set aside as excessive absent clear abuse of that broad discretion. State v. Carter, 96-358 (La.App. 5 Cir. 11/26/96), 685 So.2d 346.
Three factors are considered in reviewing a trial court's sentencing discretion: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Watts, 99-311 (La.App. 5 Cir. 8/31/99), 746 So.2d 58, writ denied, 1999-2733 (La.3/24/00), 758 So.2d 145. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. Id., at 64.
Defendant was convicted of second degree kidnapping and four counts of armed robbery. The sentencing range for second degree kidnapping is five to forty years with at least two years being imposed without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:44.1(C). A sentence for armed robbery must be served at hard labor and may range from a minimum of ten years to a maximum of ninety-nine years, without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:64(B). Defendant received the minimum sentence on all his convictions. He was sentenced to five years on the second degree kidnapping and ten years on each of the four armed robbery convictions. Defendant argues that his total sentence of forty-five years is excessive in light of his youthful age.
Minimum sentences and sentences in excess of the minimum for armed robbery have been upheld despite the youth of the defendant and/or the lack of a prior criminal history. In State v. Singleton, 96-203, (La.App. 5 Cir. 8/28/96), 680 So.2d 88, 94, writ granted in part, denied in part, 96-2380 (La.2/7/97), 688 So.2d 486,[4] *667 defendant, age 17, was convicted of four counts of armed robbery. This Court found his seventeen year sentence on each count, which was to run concurrently, was not constitutionally excessive. Defendant, along with two companions, robbed four individuals inside a bank. All three perpetrators were armed. The three young men entered the bank with guns drawn, and ordered everyone inside to lie on the floor and threatened their lives. The perpetrators demanded money. After receiving money, the three perpetrators left the bank. Defendant had no prior convictions.
Prior to imposing sentence, the trial court stated:
From a standpoint of the crime that these gentlemen were convicted of, it involved invasion of a home. It involved terror in the lives of 4 people for an extended period of time, to the extent that we invade someone's home and commit the crimes that these men were accused of committing, its inexcusable.
The trial court's statement is clearly supported by the record.
In addition, we do not find defendant's minimum five year sentence for second degree kidnapping to be excessive. Defendant effected the kidnapping by pointing a gun at the victims. The victims testified they feared for their lives. Based on the facts of the case, we do not find defendant's five year minimum sentence for second degree kidnapping is constitutionally excessive.
In our review of this assignment we also considered that defendant received an illegally lenient sentence. In particular, he received ten years on each count of armed robbery under LSA-R.S. 14:64. LSA-R.S. 14:64.3 mandates an additional five year sentence to run consecutive with a sentence imposed under LSA-R.S. 14:64 where the armed robbery was committed with a firearm. The record demonstrates the trial court failed to impose this mandatory sentence. However, because the State failed to raise the issue on appeal, the sentence cannot be disturbed. State v. Barroso, 99-1297 (La.App. 5 Cir. 5/17/00), 762 So.2d 206, 216.
For reasons discussed herein, we affirm the defendant's convictions and sentences.
AFFIRMED.
NOTES
[1] The State agreed to a severance of the two defendants for purposes of trial. Co-defendant, Brown, filed a companion appeal in this Court. State v. Brown, 01-KA-160 (La.App. 5 Cir. 5/30/01), 788 So.2d 667.
[2] The transcript demonstrates the trial court's intent to impose the minimum sentence for each crime on defendant.
[3] Defendant attached a Motion to Reconsider Sentence to his pro se supplemental appellate brief alleging his consecutive sentences are excessive and asking this Court to remand the matter to the trial court for re-sentencing. The motion is improperly made on appeal. The motion must first be made at the trial court level and must be made within 30 days of the imposition of sentence unless the trial court sets a longer period at the time of sentencing. LSA-C.Cr.P. art. 881.1.
[4] The writ in Singleton was granted only to delete the denial of eligibility for diminution of sentence for good behavior, pursuant to La. R.S. 15:571.3(A). Singleton, 688 So.2d at 486. In all other respects, the writ application was denied.