788 So.2d 667 (2001)
STATE of Louisiana
v.
Giovanni BROWN.
No. 01-KA-160.
Court of Appeal of Louisiana, Fifth Circuit.
May 30, 2001.
*668 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, *669 Assistant District Attorneys, Gretna, LA, Attorneys for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, Attorney for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
GOTHARD, Judge.
Defendant, Giovanni Brown,[1] and co-defendant, Eddie Christoff, were indicted by a grand jury on December 16, 1999 on one count of aggravated kidnaping and four counts of armed robbery occurring on October 27, 1999 in violation of LSA R.S. 14:44 and 14:64 respectively. Both pled not guilty and proceeded to separate trials.[2]
Numerous pre-trial motions were filed including motions to suppress defendant's identification, his statement and evidence seized pursuant to several different search warrants all which were denied by the trial court. In addition, the State filed a Prieur[3] notice seeking to use evidence of other crimes, and a request for a special jury charge. During the Prieur hearing, defendant made an oral Motion in Limine to exclude the evidence of prior crimes the State sought to introduce. The Court also denied the State's request for a special jury charge on flight.[4]
Defendant's first trial commenced on July 19, 2000. However, it ended in a mistrial when a juror admitted having read a newspaper article relating to the trial after being instructed by the trial court not to do so. Defendant proceeded to a second trial on July 21, 2000. After a three-day trial, the jury unanimously found defendant guilty as charged on all counts. Defendant filed a Motion for New Trial which was denied.
Defendant was subsequently sentenced to mandatory life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on count one, aggravated kidnaping. In addition, defendant was sentenced to ten years, without benefits, on each of the four armed robbery counts. All sentences are to run consecutively. Defendant now appeals his convictions and sentences.

FACTS
Between 5:30 p.m. and 6:00 p.m. on October 27, 1999, William Boada, Jr. ("Bill Jr."), age 17, was outside his home on Lake Lynn Drive in Harvey washing his father's black BMW when he was approached by defendant Brown and co-defendant Christoff. Defendant asked Bill Jr. if he wanted to buy a phone card to support defendant's school. When Bill Jr. declined, defendant asked for a pen. Bill Jr. could not find a pen in the car so he went inside the house. As he entered his house, defendant put a gun to his back.[5]
*670 Once inside, the perpetrators removed the phone from the hook, and instructed Bill Jr. to lie on the ground. Defendant demanded to know whether anyone else was in the house. Bill Jr. informed defendant his younger brother, Brian, age 15, was taking a shower. Defendant went looking for Brian while Christoff stood over Bill Jr. with a gun. Defendant was unable to find Brian and returned insisting to know Brian's whereabouts. Bill Jr. went to the locked bathroom and tried to get his brother out of the shower during which time defendant made several unsuccessful attempts to kick down the bathroom door. When Brian came out, defendant and Christoff pointed their guns at his face.
Bill Jr. and Brian were brought to the living room and asked various questions about money in the house and when their father, William Boada, Sr. ("Mr. Boada"), would be home. The victims were then taken at gunpoint to an upstairs bedroom and told to strip to their underwear. Both victims were bound with duct tape from their wrists to their elbows, from their ankles to their knees and around the head and mouth. A small hole was cut in the duct tape covering the victims' mouths. The victims were then dragged to the bathroom and left lying on their sides. Although the bathroom door was closed, Bill Jr. and Brian could hear defendant and Christoff rummaging through the house.
At approximately 7:00 p.m., Amanda King, Bill Jr.'s girlfriend, came to the house which she often did after her classes at Delgado. She knocked on the door and rang the doorbell, but there was no response. She saw shadows on the upstairs wall and thought someone was home, but not answering the door. Amanda went to a pay phone and called the house, but the line was busy. She returned to the house and rang the doorbell again. When no one answered, she opened the door slightly. She saw defendant and Christoff, both with guns, coming down the stairs. Amanda was then brought into the kitchen by the assailants.
Immediately thereafter, Mr. Boada came home and was met by defendant and Christoff, who advised they had been waiting for him. Defendant and Christoff stated that they did not want to hurt anyone but they would hurt the bound victims if Mr. Boada did "anything stupid". Defendant demanded money. While being held at gunpoint, Mr. Boada explained there was no large sum of money in the house. Defendant then inquired about a safe box he found upstairs but Mr. Boada stated there was nothing in it but papers. Mr. Boada was forced to open the box to show that it did not contain any money. At some point, defendant asked about the victim's ATM card. It was determined that Mr. Boada would go with defendant to an ATM machine and withdraw money. However, prior to leaving, Mr. Boada insisted on seeing his children.
Mr. Boada and Amanda were taken upstairs. Amanda was bound with duct tape in the same manner as Bill Jr. and Brian, and placed in the bathroom with the other victims. Mr. Boada was able to see Bill Jr. and Brian who were bound and visibly frightened.
Still wielding a gun, defendant forced Mr. Boada to drive Amanda's car, a gold Malibu, to the bank. Prior to their departure, Christoff threatened that if defendant and Mr. Boada didn't return, he would hurt the remaining victims. Once at the bank, Mr. Boada discovered he did not have his ATM card. Defendant was irritated *671 and immediately decided they would return to the house. Mr. Boada testified that defendant appeared concerned about visibility at the bank. Defendant placed Amanda's purse, which apparently was still in the car, in front of his face so the surveillance camera at the bank could not see him in the passenger seat.
Upon returning to the house, Mr. Boada was bound with duct tape and placed in the bathroom with the other victims. However, unlike the other victims, Mr. Boada's mouth was not taped. Defendant and Christoff continued to ransack the house, periodically checking on the victims. At one point, defendant told the victims he would let them know when he and Christoff were leaving. The victims believed defendant's statement meant he was going to kill them before he left. They all testified that they thought they were going to die.
Some time passed and the house became quiet. After concluding that defendant and Christoff had left, the victims untied each other. By this time, Bill Jr.'s hands were swollen and numb from lack of circulation, and he was having difficulty breathing. Mr. Boada grabbed his gun from the night stand in his bedroom and all the victims went to the neighbor's house where they called the police.
Detective Damon Johnson arrived on the scene around 9:30 p.m. and was the first police officer to arrive. He noted the house was disorderly and looked like it had been ransacked. During the investigation, it was determined that various items had been taken from the house including clothes, shoes, two watches, a stereo, computer, camcorder and digital camera. In addition, Mr. Boada's black BMW and Amanda's gold Malibu had been taken.
The investigators took photographs and lifted fingerprints from the scene. There were several identifiable fingerprints lifted from the duct tape and a Hi C Box at the scene that matched defendant's fingerprints. The victims gave a description of the perpetrators as well as the name, "Divante," which they heard Christoff call defendant.
While the police were still at Mr. Boada's house, they received a broadcast regarding the pursuit of the black BMW which was being driven by a person matching the description of one of the perpetrators. However, the driver fled after hitting another vehicle and was not apprehended. Fingerprints taken from the BMW yielded no useable prints.
Approximately three to four days after the incident, Amanda's gold Malibu was found in the river in New Orleans. Inside the car, items belonging to Amanda and Mr. Boada were found. The car appeared to have been wiped down, so efforts to obtain fingerprints were unsuccessful.
Detective John Duzac from the New Orleans police department received information from a confidential informant that two young black men were bragging about committing the Stonebridge robbery. Detective Duzac was given the names "Mike Flagstaff," who was later determined to be co-defendant Eddie Christoff, and "Giavante." On November 12, 1999, a search warrant was prepared for Christoff's last known place of residence. Prior to executing the search warrant, police showed a photo lineup containing Christoff to the victims. Bill Jr. and Brian made immediate positive identifications of Christoff, while Mr. Boada made a tentative identification and Amanda made no identification. Police executed the search warrant and found several of the items stolen from the Boada house. Christoff was subsequently arrested and gave a statement to the police.
*672 Christoff's statement led the police to defendant and a search warrant was prepared for defendant's last known address. More items that had been taken from the Boada home were found at defendant's residence. A photo lineup with defendant was then shown to the victims. Mr. Boada and Brian immediately identified defendant as one of the perpetrators of the October 27, 1999 incident. However, Bill Jr. and Amanda were unable to make an identification. But, Bill Jr. testified that he had more face-to-face time with Christoff than with defendant. Defendant was later arrested in St. Charles Parish and charged with aggravated kidnaping and four counts of armed robbery.

ANALYSIS
In brief to this court defendant assigns three errors. In the first, he asserts the trial court erred in permitting the State to introduce the hearsay statement of co-defendant, Christoff, in violation of defendant's constitutional right to confront his accusers. Defendant asserts the trial court improperly allowed the State to elicit from Detective Durel Pellegrin the substance of Christoff's statement wherein Christoff stated he committed the crime with defendant. Defendant argues Christoff was essentially able to implicate him in the crime without testifying, which impermissibly denied defendant an opportunity to cross-examine Christoff.
Defendant's appeal is based on the following exchanges that occurred during the direct examination of Detective Durel Pellegrin.
Prosecutor: All right. With regard to Mr. Christoff only, did Mr. Christoff admit to you his guilt and his participation in this very crime?
Det. Pellegrin: Yes, he did.
Defense Counsel: Objection, Your Honor. It's going to be hearsay.
Prosecutor: It's a statement against interest.
The parties approached the bench and the following dialogue occurred.
Defense Counsel: My objection is that it is hearsay, Your Honor. The State has said it's a statement against interest. Notit's against [Christoff's] interest.
The Court: It's not against theit not against this defendant.
Prosecutor: All right. But because of the fact that there are two perpetrators here, we only have one.
Now, I'm not going to get into the specifics of Mr. Christoff's statement where heyou knowwhere he says hisspecifically what he says Giovanni I just want the jury to know and I think I am entitled to admit it as a statement against interest, just the fact that he did confess.
Defense Counsel: No, Your Honor. I think what they have to do is after your statement with Mr. Christoff, was he then placed under arrest. That's as far as you can go and you can't get into the particulars of the statement.
Prosecutor: If Mr. Christoff hadn't implicated Mr. BrownI can play the whole statement. I mean, it's not hearsay. It's a statement against interest.
The party against whose interest the statement was made does not have to be a party to the case to admit the statement.
* * * * * * * * * * * * * * * * * *
Prosecutor: Well, I do want him to say, and I think it's perfectly permissible under the laws, the rules of evidence, *673 that Mr. Christoff confessed to the crime, his own involvement.
I understand that because of "Bruten" issues, I can't get into what Mr. Christoff said he did.
The Court: Do you have any objection to him asking whether Mr. Christoff confessed to the crime?
Defense Counsel: Yes, because it's hearsay.
Thereafter, a short recess was taken. When trial resumed, the following exchange took place.
The Court: Let's talk about the objection.
Prosecutor: Judge, I'm just going to go on. I'll do it in a different way.
The Court: All right. That cures that.
After some discussion regarding other matters, the direct examination of Detective Pellegrin continued. Detective Pellegrin testified that Christoff waived his rights and gave a statement. He further stated that after the statement, Christoff was taken to lockup and booked with aggravated burglary, aggravated kidnaping, armed robbery, auto theft and possession of stolen property. Thereafter, Detective Pellegrin was asked:
Prosecutor: Following taking Mr. Christoff's statement, right after you took Mr. Christoff's statement, did you havedid you learn the other name, at least first name of the suspect who was with Mr. Christoff?
Detective Pellegrin: Yes, I did.
Prosecutor: What was that first name?
Detective Pellegrin: Giovanni.
Prosecutor: Did you also learn, based on your entire investigation, including Mr. Christoff's statement, a possible address for this suspect, Giovanni?
Detective Pellegrin: Yes, I did.
Prosecutor: What was that address?
Detective Pellegrin: 3100 Rue Parc Fontaine.
Defendant argues that the prosecutor's above cited questioning of Detective Pellegrin allowed the State to offer the essential point of Christoff's confession: that he committed the crime with defendant. He specifically argues that despite the trial court's belief that the problem had been cured, the State was allowed to offer evidence of the substance of Christoff's statement.
We do not believe this matter has been properly preserved for appeal. In order to preserve an issue for appeal, a party must make a contemporaneous objection. LSA-C.Cr.P. art. 841(A) provides, in part, that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem and to prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might have been easily corrected by an objection. State v. Soler, 93-1042 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075-1078, writs denied, 94-0475 (La.4/4/94), 637 So.2d 450 and 94-1361 (La.11/4/94), 644 So.2d 1055.
On appeal, defendant only complains of Detective Pellegrin's testimony about that portion of Christoff's statement that indicates Christoff and defendant committed the crime together. However, at trial, defendant did not object to that line of questioning. Defendant's objection came earlier in Detective Pellegrin's testimony when he discussed that portion of Christoff's statement in which Christoff admitted his own participation in the crime. When Detective Pellegrin was later asked whether he learned of defendant's identity as a suspect after Christoff's statement, defendant *674 did not object. Accordingly, defendant failed to preserve the issue for appeal because he failed to lodge a contemporaneous objection to that portion of Detective Pellegrin's testimony which he now challenges on appeal.
In his second assignment, defendant argues the trial court imposed an excessive sentence. Defendant received a life sentence for his aggravated kidnaping conviction and ten years on each of the four counts of armed robbery for which he was convicted. The trial court ordered all sentences to be served consecutively. Defendant does not contest the legality of the mandatory life sentence for aggravated kidnaping; nor does he challenge the length of the sentences imposed for the armed robbery convictions or the consecutive nature of all the sentences. Instead, defendant only argues that the life sentence is excessive as applied to him in light of his youth and the facts of the case. In particular, defendant argues the facts of the kidnaping in the present case are not as egregious as those kidnaping offenses involving a ransom or rape.
It is first noted that defendant did not file a written motion to reconsider sentence under LSA-C.Cr.P. art. 881.1.[6] And, while defendant made an oral objection at the time of sentencing, his objection does not constitute an oral motion to reconsider or meet the specificity requirements of Article 881.1. In particular, upon denial of defendant's motion to deviate from the mandatory sentence provided for aggravated kidnaping, defense counsel stated, "Your Honor, note our objection and we're ready for sentencing." After defendant was sentenced, defense counsel stated, "(A)nd at this time, we would file a motion for appeal, Your Honor, objecting to the verdict and the sentence rendered in this case." In State v. Hester, 99-426 (La. App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied in State v. Patterson, 99-3217 (La.4/20/00), 760 So.2d 342, this Court determined that defense counsels' objections of, "Please note my objection to the excessiveness of the sentences ...." and "Note my objection to the sentencing, Your Honor," were insufficient to satisfy the requirements of Article 881.1. The failure to move for reconsideration of sentence or to state specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness. State v. Hester, supra.
Both the United States and Louisiana Constitutions prohibit the imposition of excessive or cruel punishment. U.S. Const. Amend. 8; La. Const. of 1974, Art. I, Sec. 20. A sentence is constitutionally excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or is nothing more than the needless and purposeless imposition of pain and suffering. State v. Robicheaux, 412 So.2d 1313 (La.1982); State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839.
Aggravated kidnaping carries a mandatory life sentence. LSA R.S. 14:44. Prior to being sentenced, defendant made an oral motion for deviation from the mandatory life sentence pursuant to State v. Dorthey, 623 So.2d 1276 (La.1993). Under *675 Dorthey, if the trial judge finds that the enhanced punishment mandated by the Habitual Offender Law, R.S. 15:529.1, makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime," the court has the option and duty to reduce such sentence to one that would not be constitutionally excessive. State v. Dorthey, supra at 1280. While Dorthey involved a mandatory sentence under the habitual offender laws, the sentence review principles espoused in Dorthey are applicable to mandatory sentences imposed by substantive criminal statutes. State v. Fobbs, 99-1024 (La.9/24/99), 744 So.2d 1274.
It is presumed that a mandatory minimum sentence is constitutional. A court may only depart from the mandatory sentence if it finds clear and convincing evidence in the present case that would rebut the presumption of constitutionality. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 676; State v. Neal, 00-41 (La. App. 5 Cir. 5/30/00), 762 So.2d 281, 286.[7] The burden is on the defendant to rebut the presumption of constitutionality by showing:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
State v. Johnson, at 676, quoting State v. Young, 94-1636 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 528, writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223. There must be substantial evidence to rebut the presumption of constitutionality. The "trial court may not depart from the legislatively mandated minimum simply because of some subjective impression or feeling about the defendant." State v. Bell, 97-1134 (La.App. 5 Cir. 2/25/98), 709 So.2d 921, 927, writ denied, 98-0792 (La.9/16/98), 721 So.2d 477. The Louisiana Supreme Court has cautioned that a departure downward from a mandatory minimum sentence should only be made in rare cases. State v. Johnson, at 677.
In the present case, defendant offered no evidence at trial to rebut the presumption of constitutionality. Rather, defendant merely argued that his age and the facts of the case warranted a downward departure from the mandatory life sentence. Defendant relied on the fact that he did not physically harm any of the victims.
In State v. Roberts, 31,219 (La.App. 2 Cir. 9/23/98), 718 So.2d 1057, 1060, writ denied, 99-1191 (La.9/24/99), 749 So.2d 627, the Second Circuit concluded that defendant's life sentence for aggravated kidnaping was not constitutionally excessive. Defendant argued on appeal that the trial court should have considered various factors concerning his background and the seriousness of the offense. The court did *676 not specifically use a Dorthey analysis but noted that defendant failed to articulate how the application of the alleged mitigating factors would have required a different sentence. The court explained that defendant was armed with a dangerous weapon and that he placed the muzzle of the pistol to the victim's head as he forced her into the vehicle. The court noted "the defendant's use of a firearm and the concomitant potential for immediate deadly consequences to the victim reflect the seriousness of the offense and the danger created by defendant's conduct." Roberts, at 1060. The court concluded that the facts did not suggest that the mandatory life sentence was excessive for the defendant, "who created a terrifying situation for a victim who did not provoke any of his actions."
In the matter before us, we do not find that the defendant offered evidence which rebutted the presumption of constitutionality. The testimony of the victims showed that the actions of this defendant put them in grave danger and caused terror and great fear for their lives. We find the facts of this case egregious enough to support the trial court's refusal to deviate from the mandatory sentence. See also: State v. Armstrong, 99-925 (La.App. 5 Cir. 2/16/00), 756 So.2d 533; State v. Baker, 00-1050 (La.App. 5 Cir. 11/15/00), 776 So.2d 1212.
In his final assignment of error, defendant requests a review of the record for errors patent, in accordance with LSA C.Cr.P. art. 920. After such review, we find no errors. Accordingly, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] Defendant was 16 years old at the time of this offense. He was tried as an adult pursuant to the authority of LSA-Ch.C. art. 305.
[2] The State agreed to a severance of the two defendants for purposes of trial. Co-defendant, Christoff, has filed a companion appeal in this Court. See; State v. Christoff, 00-1823 (La.App. 5 Cir. 5/30/01), 788 So.2d 660.
[3] State v. Prieur, 277 So.2d 126 (La.1973).
[4] The State filed an application for a writ of review in this Court to seek review of these rulings which was denied by this Court with one dissent in 00-KA-1190. The writ was denied by the Louisiana Supreme Court in 00-KK-1773.
[5] The victims described defendant's gun as being a .45 automatic handgun similar to the gun shown in Exhibit S 47. Co-defendant, Christoff, also had a gun which the victims described as a .357 revolver with an 8-inch barrel similar to the gun shown in Exhibit S-48.
[6] LSA-C.Cr.P. art. 881.1 requires that a motion for reconsideration of sentence be made orally at the time of sentencing, or in writing, and that it set forth the specific grounds on which the motion is based. The failure to state the specific grounds on which the motion is based precludes the defendant from raising the issue on appeal. State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839.
[7] State v. Johnson, supra, involves the issue of a departure downward from the mandatory minimum sentence under the Habitual Offender Law as opposed to a departure from the mandatory sentence under a substantive criminal statute. In Johnson, the Supreme Court reexamined Dorthey and clarified the factors to be considered when a downward departure from a mandatory minimum sentence was contemplated. However, since the Supreme Court has determined that the sentencing review under Dorthey is not limited to an enhanced sentence under the Habitual Offender Laws, it follows that the analysis and rationale espoused in Johnson is equally applicable to mandatory sentences not involving the habitual offender statute.