860 So.2d 66 (2003)
STATE of Louisiana
v.
Noel BERNIARD.
No. 2003-KA-484.
Court of Appeal of Louisiana, Fifth Circuit.
October 15, 2003.
*69 Jane L. Beebe, Gretna, LA, for Appellant.
Noel Berniard, Homer, LA, Appellant Pro Se.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Appellate Counsel, Andrea F. Long, Counsel of Record on Appeal, Gordon R. Konrad, Trial Counsel, Thomas S. Block, Trial Counsel Assistant District Attorneys, Gretna, LA, for Appellee.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY and SUSAN M. CHEHARDY.
JAMES L. CANNELLA, Judge.
Defendant, Noel Berniard, appeals from his conviction of aggravated rape and sentence of life imprisonment. We affirm and remand.
Defendant was indicted by a grand jury for the aggravated rape on July 21, 2001 of his estranged wife, P.B.[1], a violation of La.R.S. 14:42. He was subsequently charged by Bill of Information with attempted forcible rape of the same victim on July 16, 2001, a violation of La.R.S. 14:27 and 14:42.1. He pled not guilty and, after various pre-trial motions were disposed of, was tried by a 12 person jury from July 30, 2002 until August 2, 2002. The jury found him guilty of aggravated rape and not guilty of attempted forcible rape. On September 5, 2002, the Defendant was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence, with credit for time served.
Defendant and P.B. met in 1991 when they were working for the Orleans Criminal Sheriff's Office. They married in 1993. In 1994, P.B. left the Orleans Criminal Sheriff's Office to work for the Orleans Civil Sheriff's Office. During this time, P.B. became pregnant and problems arose in their marriage. However, the couple stayed married and after six years, they moved to Jefferson Parish. P.B. was working full time at night and attending school during the day. Defendant was employed with the Orleans Criminal Sheriff's Office for ten years at the time of this incident. According to P.B., she was receiving very little support or domestic help from her husband and the marriage was in jeopardy.
On March 18, 2001, the Defendant and P.B. had an argument and he moved into his mother's house for approximately two weeks. In an effort to save the marriage, P.B. scheduled a six-day cruise, starting April 8, 2001. Defendant returned to the couple's home a week or so before the cruise. During that vacation, the couple quarreled over money that the Defendant was using to gamble during the cruise, which ruined the cruise for P.B. P.B. testified that upon returning home after the cruise, she discovered that the Defendant was increasingly untruthful about various matters. As the marriage was becoming progressively rockier, P.B. arranged for marriage counseling. She abandoned seeking counseling when Defendant showed no interest in attending the meetings and provoked arguments at the time of the scheduled meetings.
On June 19, 2001, P.B.'s birthday, Defendant again moved out of the couple's *70 home and stayed with his mother for three days. During his absence, P.B. consulted an attorney about a divorce. According to P.B., she was instructed by the attorney to remain in the matrimonial domicile, so that she would not be accused of abandonment. When she discussed her decision to obtain a divorce with the Defendant, he said that he would not give her one. However, when the Defendant returned home the second time, P.B. did not sleep with him. Rather, she slept alone in the master bedroom, the guest bedroom, or on the couch, away from him. Even though she attempted to remain separate from him, he gave her "no peace." Defendant argued with her in front of the children, turned lights on and played loud music to keep her from sleeping, removed the door locks from the guest bedroom where she first slept after he returned home, videotaped her in the shower, threw food away while she was cooking, kicked open the bedroom door, and refused to help with the household expenses. P.B. indicated that the domestic unrest was having an adverse effect on the children, who were becoming angry, experiencing bad dreams, and wetting their beds. In order to buy food and pay the house note, P.B. sought financial assistance from the pastor of her church. During this domestic unrest, P.B. was working at night and attending school during the day.
P.B. testified that, on July 16, 2001, she was sleeping on the couch when the Defendant returned to the house late at night. He attempted to touch and feel her and she told him to leave her alone. When he persisted, she went into the master bedroom. The Defendant followed her and he began to pull off her clothes. P.B. told the Defendant that she no longer wanted him. He retorted that she was his wife and he could do what he wanted. A struggle ensued and P.B. pushed and kicked to free herself, but she could not repel him. She claims that the Defendant, who is six feet tall, held his left arm on her chest and pushed her down with his hand. After removing her clothes, the Defendant tried to force P.B. to engage in sex. He did not penetrate her during the assault, but he did ejaculate on her. P.B. told Defendant that she was not his wife any longer and that she hated him. She also told the Defendant that, if he ever did this again, she would call the police. P.B. stated at trial that she did not report the incident because she felt that she had no case since there was no penetration. After this incident, the Defendant tried to turn the children against her by telling them that their mother did not love him.
On Friday, July 21, 2001 at approximately 6:00 a.m., P.B. returned home after working a night shift. She showered and went to sleep for a few hours before waking up for a 9:35 a.m. hairdresser's appointment. Around 9:00-9:30 a.m., Defendant woke her by touching her and kissing her feet. She pushed him away, got up, and went to the master bedroom to dress for her appointment. While there, the Defendant's cell phone, which was in the room, rang and she handed it to him. The Defendant claimed that she pestered him to answer it because she had suspicions that he was cheating on her. He refused to answer it. P.B. then saw him remove a pair of scissors from the bathroom counter. He told P.B. that she was not going anywhere, pushed her on the couch and pulled at her clothing, as if he was going to cut them off of her. A struggle ensued during which the Defendant forcibly removed her clothes and then removed his shorts. During the struggle, P.B. begged him to stop. P.B. kicked, bit, scratched and pushed him and told him he was going to go to jail. Despite her efforts to repel Defendant's advances, the Defendant *71 forced himself sexually on her, penetrated her vaginally, and ejaculated.
After the incident, the Defendant took the telephone and dialed some numbers. P.B. thought that he dialed 911 based on his comments. He did this twice, and after the second time, slammed the phone down and began to curse. Since P.B. wasn't sure that he had actually called 911, she tried for and got the phone. She dialed 911 before the Defendant grabbed it away from her. P.B. then got dressed as the two waited for the police. For some unexplained reason, the Defendant put on a pair of P.B.'s underpants during this time. When a police officer arrived, P.B. walked outside to meet him. She was met by Deputy Michael Burgess of the Jefferson Parish Sheriff's Office (JPSO), who testified that she was upset and scared, and told him, "I was raped and he's inside."
Officer Burgess called for back-up assistance. He then entered the house alone shouting "Sheriff's Office." He received no response, so he drew his revolver as he proceeded through the house. He found the Defendant partially naked and wearing a pair of women's underpants. The Defendant did not resist the officer. Officer Burgess felt that the suspect was surprised to see him. Defendant informed Officer Burgess that he, too, was in law enforcement and that there was a weapon in the house. The Defendant got the gun and handed it to the officer. The officer testified that the Defendant made several comments about the incident before being removed from the scene. He first mumbled, "Oh, man, I shouldn't have done it, I'm in trouble." When Officer Burgess told the Defendant to get dressed, he responded, "I shouldn't have beat [sic] my wife and I shouldn't have raped her." The Defendant was arrested and read his Miranda rights.[2] Before being escorted to the police unit, the Defendant said, "I shouldn't have done that, man. Am I going to loose [sic] my job?" The Defendant asked for permission to tell his daughter good-by and was allowed to do so. However, instead he told her, "Your mama's got me arrested now. What do you think of the b___ now. She's having me arrested." The child was then removed from the room. Defendant also asked for his keys before being taken to the police car and he told P.B., "You know where my f___ keys are, b___. Go get them. I need them now. Don't f___ just stand here. Go get them." Officer Burgess instructed the Defendant to get the keys, after which, the officer put the Defendant in the police car under the control of another officer. While there, the Defendant used his car keys to set off the car alarm, and it took three officers to wrest Defendant's car keys from him. The officer noted that, although P.B. is trained in law enforcement, the Defendant was in better physical shape than P.B.
Officer Burgess returned to the house where he took a statement from P.B. and she showed him the pair of scissors. Crime scene photographs were taken. Photographs were also taken of the injuries to P.B. and Defendant. P.B. had marks on her arm, face, and neck, as well as a blood stain on her shirt. On the Defendant, scratch marks were evident on his back, shoulders, chest, and left forearm.
The Defendant was transferred to the Sheriff's Office by Officer Burgess. During the transfer, the Defendant told the officer, "I shouldn't have done this type of stuff," and "Man, I shouldn't have used those scissors to rape my wife."
Detective Mike Hullihan of the Personal Violence Unit of the JPSO counseled P.B. *72 at her home following the incident and advised her to go to the hospital for a rape examination. P.B. followed Detective Mike Hullihan to Lakeside Hospital where she was examined by Dr. W. Caplan, a gynecologist and obstetrician. Dr. Caplan conducted a physical exam, collected evidence, and wrote a report. P.B. reported to the doctor that her estranged husband forced her to engage in vaginal intercourse, during which he ejaculated. The physical examination revealed the existence of motile and non-motile sperm in the vaginal area. No vaginal tearing was noted. However, Dr. Caplan stated that such damage is not usually found in a victim who has previously been sexually active.
When the doctor was finished with his examination, Detective Hullihan audio-taped an interview with P.B. During her statement, P.B. was upset and crying as she informed him about the events that had occurred on July 16, 2001 and July 21, 2001. She told the Detective that she resisted Defendant's sexual advances by scratching, kicking, and punching her assailant, but was unsuccessful in repelling him. She also told him that, in the June 21st encounter, Defendant had a pair of scissors which she feared he would use to cut off her clothes. She did not fear that he would use them to hurt her. Detective Hullihan testified that P.B. had an abrasion on her left cheek at the time she gave the statement.
At trial, Defendant testified, portraying P.B. as a jealous and suspicious wife. According to him, on July 21, 2001, P.B. woke him up 6:15 a.m. when she got home from work and they had consensual sex later that morning. He denied raping P.B. and denied using scissors to try to cut off her clothes. Defendant said that he argued with P.B. after having engaged in consensual sex because P.B. accused him of cheating. He claimed that he did not throw anything at P.B., but that she had thrown things at him. Defendant claimed that P.B. became upset when his cell phone rang and he was not there to answer it. Defendant contended that this caused P.B. to become angry and she scratched and punched him for about 15 to 20 minutes because she thought he was cheating on her. Defendant also denied making any statements to the arresting officer other than asking the nature of his arrest. Defendant claimed that Officer Burgess lied when he recounted the various statements allegedly made to him by Defendant, essentially admitting the rape.
Briefs were filed by both appellate counsel and Defendant. In both briefs, Defendant argues that the evidence was insufficient to support the jury's verdict of aggravated rape and that the sentence is excessive for a first time offender. In his pro se brief, Defendant further alleges ineffective assistance of counsel.
Defendant asserts that the State failed to prove a "rape" because the incident of sexual penetration on June 21, 2001 was consensual. At most, he contends that the evidence shows that he was guilty of forcible rape. He argues that P.B.'s testimony is inconsistent and there is irreconcilable conflict with the physical evidence. In particular, he alleges that neither the physical evidence nor the victim's testimony indicated her husband's physical assault was "resisted to the utmost" and her testimony that she resisted her husband, but was unable to get out from under his elbow, was not credible because P.B. is a trained law enforcement officer. Defendant notes that the only physical injury displayed by P.B. was a scratch on her chin. Defendant also alleges that P.B.'s testimony was inconsistent. In particular, he alleges that she was neither threatened, nor afraid for her life. He contends that *73 P.B. first reported that he threatened her with a pair of scissors during the assault, but at trial testified that she was not afraid for her life.
The standard for appellate review of the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Johnson, 01-1362, p. 7-8 (La.App. 5th Cir.5/30/02), 820 So.2d 604, 608, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32. When the trier-of-fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Cazenave, 00-183, p. 14 (La.App. 5th Cir.10/31/00), 772 So.2d 854, 860, writ denied, 00-3297 (La.10/26/01), 799 So.2d 1151. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. State v. Ruffin, 02-798, p. 10 (La.App. 5th Cir.12/30/02), 836 So.2d 625, 630. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. State v. Marcantel, 00-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56.
La.R.S. 14:42 states:
A. Aggravated rape is a rape committed... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a weapon.
Under La.R.S. 14:42.1, forcible rape, is defined in part, as when the vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed "(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape."
The difference between aggravated rape and forcible rape is the "degree of force employed and the extent to which the victim resists." State v. Parish, 405 So.2d 1080, 1087 (La.1981); State v. Puckett, 02-997, p. 10 (La.App. 5th Cir.1/28/03), 839 So.2d 226, 231. A greater degree of force is necessary to justify the more serious punishment imposed for aggravated rape. State v. Jackson, 437 So.2d 855, 858 (La.1983). The degree of force employed and the determination of the grade of rape is for the jury to decide. State v. Cepriano, 00-213, p. 9 (La.App. 5th Cir.8/29/00), 767 So.2d 893, 899. Nonetheless, the mere fact the defendant was unarmed and the victim suffered no extensive physical pain or injury does not negate the possibility that an aggravated rape occurred. Puckett, 02-997 at p. 8, 839 So.2d at 231.
P.B.'s testimony that she fought unsuccessfully to repel the Defendant was supported by the other evidence. The Defendant's torso was scratched in many places, P.B. had marks and an abrasion on her face, and a spot of blood was on her shirt. The medical examination showed that P.B. had vaginal intercourse that day. *74 She was visibly upset when she described the events to the police and the doctor and her trial testimony was consistent with her interviews. In addition, she explained the alleged inconsistency relative to the scissors, saying that she was not afraid for her life, but she was afraid the defendant would use the scissors to cut her clothing off. She never claimed that she was afraid for her life. She contended that the Defendant forced himself on her without her consent, and that she resisted to the utmost. This is plausible under these facts. Defendant is six feet tall and so physically strong that it took three police officers to get his keys from him when he was in the police unit, waiting to be transported to jail
The law does not require that the perpetrator of the rape be armed with a weapon, as argued by Defendant, but only that such force is used that the victim cannot dislodge the perpetrator. The jury heard the testimony of P.B., the witnesses, the Defendant, and apparently believed P.B. that the degree of force used by Defendant to subdue P.B. was such that a verdict of aggravated rape was warranted, rather than forcible rape. Since there is no internal contradiction or irreconcilable conflict with the physical evidence, P.B.'s testimony was sufficient for the jury to find Defendant guilty beyond a reasonable doubt of that crime. Thus, considering Officer Burgess's testimony, the photographic evidence of her injuries, Defendant's admission, P.B.'s testimony and corroborative physical evidence, we find that, under the Jackson standard for sufficiency of the evidence, a rational trier of fact could have found that the State proved the essential elements of the crime of aggravated rape beyond a reasonable doubt.
Defendant asserts next that his sentence is excessive, constituting cruel and disproportionate punishment. He contends that a downward deviation from the mandatory sentence is warranted because he has no prior criminal record, he has been an outstanding citizen, the act arose from a marital conflict with a jealous wife who made up the allegations of rape, he is a 30 year old father of two girls, he was married for 10 years and he had been in law enforcement for 10 years.
The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of excessive or cruel punishment. A sentence is excessive if it is grossly disproportionate to the seriousness of the offense so as to shock our sense of justice, or if it imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992); State v. Brown, 01-160, p. 14 (La.App. 5th Cir.5/30/01), 788 So.2d 667, 674. Although a sentence is within statutory limits, the sentence may nonetheless violate a defendant's constitutional right against excessive sentence. State v. Wilson, 01-2815, pp. 3-4 (La.11/22/02), 836 So.2d 2, 4, citing State v. Sepulvado, 367 So.2d 762, 767 (La.1979).
In reviewing a sentence for excessiveness, this Court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock our sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing sentence. A sentence within statutory limits will not be set aside as excessive absent manifest abuse of discretion. State v. Lobato at 751; State v. Sims, 02-1244, p. 8 (La.App. 5th Cir.4/29/03), 845 So.2d 1116, 1121.
It is presumed that a mandatory minimum sentence is constitutional. A court may only depart from the mandatory *75 sentence if it finds clear and convincing evidence that would rebut the presumption of constitutionality. State v. Johnson, 97-1906, p. 7 (La.3/4/98),709 So.2d 672, 676; Brown, 01-160 at 15, 788 So.2d at 676.
In State v. Fobbs, 99-1024 (La.9/24/99), 744 So.2d 1274, 1275 the Louisiana Supreme Court held that the sentencing review under State v. Dorthey, 623 So.2d 1276, 1280 relative to downward departures from mandatory sentences in a habitual offender case is not limited to those sentences. In Brown, a case involving aggravated kidnapping, we applied the principles set out in Dorthey, as reexamined in Johnson. There we noted that downward departures from a mandatory minimum sentence should only occur in rare cases. Brown, 01-160 at 15, 788 So.2d at 675, citing Johnson, 97-1906 at 8, 709 So.2d at 677. In addition, we have held that the trial court may not depart from the mandatory minimum sentence because of some subjective impression about the defendant. State v. Bell, 97-1134, p. 17 (La.App. 5th Cir.2/25/98), 709 So.2d 921, 927, writ denied, 98-0792 (La.9/16/98), 721 So.2d 477.
When a defendant seeks a downward deviation from the mandatory sentence, the defendant has the burden to rebut the presumption of constitutionality by showing by clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. Brown, 01-160 at 15, 788 So.2d at 675.
In this case, at the sentencing hearing, Defendant sought leniency in sentencing, noting that he had been an outstanding citizen and had served the community for 10 years. The trial judge denied the request, stating:
THE COURT:
The Court takes notice that the defendant was found guilty of aggravated rape by a jury of his peers on August 2, in the year, 2002.
In imposing sentence herein, the Court takes notice of the provisions of Article 894.1 of the Code of Criminal Procedure. The Court further takes notice that the crime of aggravated rape, by law, carries a mandatory minimum sentence of life imprisonment, which sentence must be served without benefit of probation, parole or suspension of sentence. The Court notes further in imposing sentence herein takes into consideration the statements made by the defendant. However, the Court further notes that it is without authority, by law, to impose any sentence less than that which is required. The Court notes that the offense of which the defendant was convicted was a felony and that in accordance with law it is mandatory that he be sentenced to a period of incarceration which must be served life without benefit of probation, parole or suspension of sentence. The offense being committed was an act of violence of rape against another party. Accordingly, the Court sentences the defendant to life imprisonment and the sentence is ordered pursuant to statute to be served without benefit of parole, probation or suspension of sentence. The Court orders that the defendant be given credit for time served and remanded to the custody of the Department of Public Safety and Corrections for execution of sentence....
Thereafter, Defendant filed a Motion for Reconsideration of Sentence alleging that the trial judge failed to consider mitigating circumstances and the sentence was unconstitutionally excessive. At the hearing on the motion for reconsideration, Defendant again asserted these two grounds for *76 reduction of his sentence. In denying the motion for reconsideration, the trial judge responded:
THE COURT:
All right. The Court finds that there has been a failure to articulate before the Court any mitigating factors which were properly placed before the Court on or before sentencing for which the Court failed to consider. So, I find as to the motion filed, Item 1 is without merit.
The Court, in considering Item 2, that the sentence imposed was unconstitutionally excessive and constituted cruel and unusual punishment, the Court notes the legislative statute, as well as the jurisprudence concerning the aggravated rape and the penalty which is contained therewith in the line of Supreme Court cases relative to this matter, and finds that the second issue is without merit and, therefore, denies the Motion to Reconsider Sentence.
The record reflects that the trial judge was aware of the factors urged by Defendant in mitigation of the mandatory sentence. Although the trial judge felt compelled by law to impose the sentence which was statutorily mandated, the life sentence was warranted nevertheless because Defendant failed to carry his burden for a reduction of the sentence below the statutorily prescribed mandatory sentence. His depiction of the facts, that the charges arose out of a marital conflict with a jealous wife, was rejected by the jury as lacking credibility. Defendant was in a position of trust as a law enforcement officer at the time of the crime and he has now been convicted of a crime of violence. In addition, Defendant's lack of a criminal record is not sufficient to justify a downward departure. See: State v. Hernandez, 02-892, p. 5 (La.App. 5th Cir.01/28/03), 839 So.2d 281, 285, citing State v. Knight, 01-881, p. 7 (La.App. 5th Cir.2/13/02), 811 So.2d 947, 950-951.
The factors of age and marital status are raised for the first time on appeal and are not subject to review. See: State v. Rutledge, 34,834, pp. 4-5 (La.App. 2nd Cir.6/20/01), 792 So.2d 31, 33; La. C.Cr.P. art. 881.1. Even if the factors of age and marital status had been preserved for review, these factors alone would not be sufficient to justify a downward departure. See: Hernandez, 02-892 at 5, 839 So.2d at 285 (age and family support insufficient).
Under the facts presented, then, we find that sentence imposed is not constitutionally excessive and the trial judge did not err in rejecting the Defendant's request for a downward deviation of the mandatory sentence.

PRO SE ASSIGNMENT OF ERROR.
Defendant argues pro se that his trial counsel was ineffective for failure to impeach alleged inconsistent statements made by the victim and for failing to present expert medical evidence.
The Defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution of 1974. In assessing a claim of ineffective assistance of counsel, the courts apply a two-pronged test. The Defendant must show that (1) his attorney's performance was deficient and (2) the deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); State v. Soler, 93-1042 (La.App. 5th Cir.4/26/94), 636 So.2d 1069, 1075, writs denied, 94-0475 (La.4/4/94), 637 So.2d 450, and 94-1361 (La.11/4/94), 644 So.2d 1055. The error is prejudicial if it was so serious that it deprived the Defendant of a fair trial, or *77 "a trial whose result is reliable." Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Serio, 94-131 (La.App. 5th Cir.7/1/94), 641 So.2d 604, 607, writ denied, 94-2025 (La.12/16/94), 648 So.2d 388.
In order to show prejudice, the Defendant must demonstrate that the outcome of the trial would have been different, but for counsel's unprofessional conduct. Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; Soler, 636 So.2d at 1075. Effective assistance of counsel does not mean errorless counsel, or counsel who may be judged ineffective on mere hindsight. State ex rel. Graffagnino v. King, 436 So.2d 559, 564 (La.1983). Because there is no precise definition of reasonably effective assistance of counsel, any inquiry into the effectiveness of counsel must be specific to the facts of the case. State v. Peart, 621 So.2d 780, 787 (La.1993); State v. Addison, 00-1730, p. 11 (La.App. 5th Cir.5/16/01), 788 So.2d 608, 615.
Claims for ineffective assistance of counsel are most appropriately addressed through application for post-conviction relief, so as to afford the parties an adequate record for review. Peart, 621 So.2d at 787. However, the Court can address the issues if the record contains sufficient evidence to decide the issue, and the issue is properly raised by assignment of error on appeal. State v. Hamilton, 92-2639, p. 4 (La.7/1/97), 699 So.2d 29, 31, cert. denied, 522 U.S. 1124, 118 S.Ct. 1070, 140 L.Ed.2d 129 (1998); State v. Pendelton, 00-1211, p. 10 (La.App. 5th Cir.3/14/01), 783 So.2d 459, 465-466. After consideration of the entire record, we find that the record contains sufficient evidence to decide the ineffective counsel issue and that the issue is properly raised by assignment of error on appeal.
Defendant alleges that the victim's credibility was crucial in this case and his counsel should have impeached her on certain alleged inconsistencies between her statements to police and her trial testimony. He lists as inconsistent the statements concerning threats by Defendant to the victim, the exact bedroom where the rape occurred, and whether the victim bit him.
The record indicates that defense counsel engaged in a vigorous cross-examination of P.B. He specifically questioned her during cross-examination about an apparent conflict between her statement to police and her trial testimony concerning whether she felt "threatened" by Defendant's use of the scissors. She explained that she feared that he would cut her clothes, not that he would harm her. Counsel also explored the subject of P.B.'s motivation for filing the charges, and he attacked her veracity in stating that she resisted Defendant's sexual advances. Thus, her credibility was attacked during cross-examination at trial. Counsel's performance in this regard was not deficient.
Defendant also alleges that counsel's performance was deficient because he failed to present "expert medical evidence concerning the lack of physical evidence." However, a review of the record indicates that defense counsel, during his cross-examination of the State's medical expert, Dr. Caplan, established that no physical injuries were noted in the report of the physical exam. The lack of physical injuries was established. The presentation of an additional medical expert for this purpose would have been unnecessary and duplicitous. Consequently, we find that Defendant has failed to establish that his counsel was deficient for failing to present expert medical evidence concerning the lack of physical evidence.
Moreover, the Defendant did not establish prejudice, the second prong of the Strickland test. The Defendant was *78 acquitted of one of the two counts with which he was charged. On the charge of aggravated rape, there was considerable evidence against him. The victim's testimony was corroborated by the physical evidence, the testimony of the officer and the doctor, well as by Defendant's own numerous admissions against interest.
After our review of the record, we find that Defendant has failed to carry his burden under Strickland to show that the performance of his counsel was deficient and that he suffered any prejudice. Thus, we find that the Defendant was not deprived of a fair trial by ineffective assistance of counsel.

ERROR PATENT
The record was reviewed for patent errors, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Perrilloux, 99-1314 (La. App. 5th Cir.5/17/00), 762 So.2d 198. We find one patent error. La.R.S. 15:542(E). La.R.S. 15:540, et seq., requires registration of sex offenders and La.R.S. 15:543(A) requires the trial judge to provide written notification of the registration requirement of La.R.S. 15:542. The trial judge failed to provide to Defendant the required written notice. Consequently, we will instruct the trial judge to send written notice to Defendant of the registration requirement and to file a copy of same in the record, in accordance with State v. Stevenson, 00-1296 (La.App. 5th Cir.1/30/01), 778 So.2d 1165.
Accordingly, Defendant's conviction and sentence are hereby affirmed. We remand for the trial judge to inform Defendant of the registration requirements of La. R.S. 15:542, by sending appropriate written notice to him within ten days of this opinion, and to file written proof in the record that the Defendant received such notice.
CONVICTION AND SENTENCE AFFIRMED; REMANDED.
NOTES
[1] In accordance with La.R.S. 46:1844(W)(3), and in order to protect the identity of the victim, a victim of a sex offense, we will refer to her by initials.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),