NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-442

STATE OF LOUISIANA

VERSUS

AUSTIN MOTT, JR.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 25857-15
HONORABLE RONALD F. WARE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

PHYLLIS M. KEATY
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy Howard Ezell, and Phyllis M. Keaty, Judges.

CONVICTION AND SENTENCE AFFIRMED.
MOTION TO WITHDRAW GRANTED.

**John F. DeRosier**
**District Attorney**
**Carla S. Sigler**
**Karen C. McLellan**
**Cynthia Killingsworth**
**Assistant District Attorneys**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana   70601**
**(337) 437-3400**
**Counsel for Appellee:**
          **State of Louisiana**

**Paula Corley Marx**
**Louisiana Appellate Project**
**Post Office Box 82389**
**Lafayette, LA 70598-2389**
**(337) 991-9757**
**Counsel for Defendant/Appellant:**
          **Austin Mott, Jr.**

**KEATY, Judge.**

On November 12, 2015, Defendant, Austin Mott, Jr., was charged by bill of indictment with one count of aggravated rape, a violation of La.R.S. 14:42. Defendant filed a motion to waive his right to a jury trial, which the trial court granted by order dated May 27, 2016. At the conclusion of a one-day bench trial held on February 13, 2017, Defendant was found guilty as charged. Four days later, the trial court sentenced Defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.

Defendant timely appealed. His appellate counsel has filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967), alleging that the record contains no non-frivolous issues for appeal and requesting that she be allowed to withdraw as counsel of record. Defendant was advised, via certified mail, that counsel filed an *Anders* brief, and he was given until August 2, 2017, to file a pro se brief; to date, he has not done so. After review, we affirm Defendant's conviction and sentence and grant appellate counsel's motion to withdraw.

## DISCUSSION

### *TESTIMONY AND EVIDENCE PRESENTED AT TRIAL*[1]

The victim, M.P.,[2] testified that she had gone for a run near the Lake Charles Civic Center around 9:30 a.m. on October 5, 1999, after she finished her shift as a registered nurse at Lake Charles Memorial Hospital (LCMH or the hospital). She was thirty-nine years old at the time. She had planned to run with her co-worker Katie, but Katie had to work late. After her run, M.P. went to a nearby bathroom and was washing her hands when a man ran in behind her, putting his arm on her

---

[1] We have omitted portions of the testimony not relevant to resolution of this appeal.

[2] The victim's initials are used to protect her identify. *See* La.R.S. 46:1844(W).

throat and his hand over her mouth.  She fought and tried to get away from him for a long time.  M.P. described the incident as follows:

> I was trying to get his hand off of my throat.  I remember biting him.  When I bit him, he let go and he hit me.  I felt my nose crack, and I fell.

> When I fell on the cement in front of the lavatory, he straddled me; and he got on top of me and he just started beating me and beating me and beating me.  I remember turning my face this way so that I wouldn't get a direct hit.

> I don't remember how I got from laying on the floor in front of the sink to in the stall.  I just remember that I had to have been thrown because I popped my head real hard between the toilet - - the wall and the toilet.

> And I don't - - I remember my face was turned; and I kept thinking if I didn't look at him, he wouldn't kill me.  And then he grabbed my legs and pulled me, and he started taking my pants - - I had on underwear, leggings, and shorts; and I had on a t-shirt and a sweatshirt.

> He started pulling my clothes down, and the next think I remember is he pulled me to him, and he was on his knees in front of me.  I remember the warmth of the front of his legs, hitting the back of my legs, because he had my legs up and I was on my back.

> He said, "You are going to like this."  And then I - - and the next thing I remember, I was looking up and I couldn't breathe.  I felt like somebody was standing over me like pouring something warm in my mouth, and I kept gasping, and I couldn't catch my breath, and he grabbed me by the hair, and he threw me over the toilet.

M.P. testified that after Defendant left the bathroom, she must have gotten herself dressed, but she did not remember doing so.  She was covered in blood when she exited the bathroom.  She asked the first man she saw for help, but he refused.  Then two men in a truck offered to bring her to the hospital.  She did not want to get into their truck, so she asked them to lower the tailgate and give her a ride to her car.  The men did so and then followed her to the hospital.  M.P. stated that she called her friend Katie to tell her that she had been attacked.  When she arrived at LCMH, her friend, Liz, was waiting there for her, although M.P. did not

remember calling her. M.P. told Liz that she wanted to go home, but Liz persuaded her to go into the Emergency Room (ER). The ER was full of people who were asking her what happened. At first, she was embarrassed so she told everyone that she had only been beaten up. Later, a police officer arrived, ordered everyone out of the ER, and assured her that whatever had happened was not her fault. M.P. then told the officer "what really happened." A full rape kit examination was done, which included having her vagina and hands swabbed. M.P.'s nose was broken and had to be stitched up. Three days later, a stint was put in to straighten her nose, but surgery could not be performed at that time because her face was too swollen. M.P. eventually had two facial surgeries which helped her to breathe better.

M.P. later gave a statement to police and described her attacker to a sketch artist. The resulting sketch was displayed across town, but her attacker was not identified at that time. M.P. acknowledged that when she initially gave her statement to the police, she did not want to believe that she had been raped, and she could not definitively say whether she had been penetrated by her attacker. M.P. stated that she changed her mind due to the DNA results from the swabs taken from her vagina.

The two friends, who M.P. referred to in her testimony, also testified at trial. Elizabeth Katchur stated that she received a call from M.P. the morning of October 5, 1999. M.P. was hysterical, so Ms. Katchur left work to join her at the hospital. When they met, M.P. was covered in blood and disoriented. Ms. Katchur stayed at the hospital with M.P. most of the day before bringing her to the police department and finally home. Katie Maddox also testified at trial. She explained that she was not able to go running with M.P. as planned on October 5, 1999, because of work obligations. Around lunchtime that day, Ms. Maddox noticed that

her answering machine was blinking. When she played the message, she heard M.P. screaming that she had been attacked and needed help, and that she was going to the hospital because her nose was broken and there was blood everywhere.

Sergeant Jason Derise with the Lake Charles Police Department (LCPD) testified that he was dispatched to LCMH in reference to a battery committed on October 5, 1999. When Sergeant Derise first spoke to M.P., she told him that she had been beaten, but he thought "there was more to the story." M.P. was crying and appeared scared and embarrassed so he made everyone leave the room before asking "point blank exactly what happened." According to Sergeant Derise, M.P. stated that she was in a bathroom near the civic center when a white male came in and began punching her in the face. She described what her attacker "looked like, his height, his weight, his eye color, [and] the clothing that he was wearing," and she estimated that he was between twenty and thirty years old. Although M.P. did not know whether she had been penetrated, Sergeant Derise called in detectives to interview her because her pants had been pulled down and she had been beaten so badly. Sergeant Derise described M.P.'s face as swollen as that of "a boxer that had just gotten beat." Sergeant Derise completed a police report in conjunction with his investigation. He noted therein the names of the men that had followed M.P. to the hospital.

Lieutenant David Streva, an officer in the LCPD crime scene division, testified that he was dispatched to LCMH to take photographs to document the victim's injuries. After doing so, he brought the sexual assault kit that had been done on M.P. to the evidence room at the police department. He then went to the crime scene where he took photographs that showed blood on the restroom floor both inside and outside of a stall. In conjunction with Lieutenant Streva's

4

testimony, the State offered into evidence, without objection, the eighteen photographs that he took in this matter, along with M.P.'s sexual assault kit.

Tammy Vincent, a sexual assault nurse examiner (SANE), testified that she took care of M.P. at the hospital. She did a complete physical exam, documenting M.P.'s injuries and collecting evidence in the process. Nurse Vincent took several swabs from deep inside M.P.'s vaginal canal, underneath her cervix. She did not swab the outside of M.P.'s vaginal area. Nurse Vincent also swabbed M.P's hands and collected her clothing to put into the rape kit. When questioned on cross-examination as to whether "a quantity of bodily fluids that are not inside the vagina initially [can] find their way into the vagina," Nurse Vincent stated that it is "unlikely."

Lieutenant Kevin Kirkum testified that he pulled M.P.'s case in December 2014, while reviewing cold cases as commander of the sex crimes unit of the LCPD. After getting M.P.'s approval to reopen the case, Lieutenant Kirkum interviewed her and obtained a new DNA sample from her mouth. He sent that sample, along with the DNA samples contained in the rape kit, to a lab for retesting. A DNA profile was obtained from one of the samples. When the profile was put into CODIS, a national crime database system, Defendant was reported as a match. Defendant was located in Texas, and Lieutenant Kirkum traveled there with evidence officer Jordan Ashworth to take swabs from the inside of Defendant's mouth. Defendant was arrested after the samples revealed a positive DNA match. According to Lieutenant Kirkum, Defendant was twenty-eight years old when this crime occurred. As part of his investigation, Lieutenant Kirkum obtained a duplicate of the police sketch that had been drawn in 1999, which was accepted into evidence.

5

Philip Simmers, a DNA analyst with the Louisiana State Police Crime Lab, was accepted at trial as an expert in DNA analysis. Mr. Simmers tested the DNA in the rape kit and compared it to the reference samples that Lieutenant Kitchum had recently obtained from M.P. and Defendant. Thereafter, Mr. Simmers concluded that Defendant could not be excluded as the major contributor to the DNA profile obtained from a swab taken from M.P.'s left hand. That hand swab generated a "STR" DNA profile, meaning that the chance of the DNA coming from an individual other than Defendant was approximately one in 270 quintillion for the Caucasian population, one in 167 sextillion for the black population, and one in 31.5 sextillion for the southwest Hispanic population. The swabs taken from M.P.'s vagina and her left hand also generated the same "Y-STR" DNA profile, meaning that the DNA on those two swabs came from the same male or any of his male paternal relatives. On cross-examination, Mr. Simmers explained that the Y-STR of Defendant and his father, Austin Mott, Sr., would be the same. In his questioning of Mr. Simmers, Defendant's trial counsel noted, without objection, that Austin Mott, Sr., died in 2005.

After being advised by the trial court of his right to testify, Defendant stated that he did not wish to testify. Thereafter, the trial court, from the bench, found Defendant guilty of aggravated rape.

## ANDERS ANALYSIS

As stated previously, Defendant's appellate counsel has filed a brief pursuant to *Anders*, 386 U.S. 738, alleging the record contains no non-frivolous issues for appeal and requesting this court grant his accompanying motion to withdraw. In *State v. Benjamin*, 573 So.2d 528, 531 (La.App. 4 Cir. 1990), the fourth circuit explained the analysis based on *Anders*:

When appointed counsel has filed a brief indicating that no non-frivolous issues and no ruling arguably supporting an appeal were found after a conscientious review of the record, *Anders* requires that counsel move to withdraw. This motion will not be acted on until this court performs a thorough independent review of the record after providing the appellant an opportunity to file a brief in his or her own behalf. This court's review of the record will consist of (1) a review of the bill of information or indictment to insure the defendant was properly charged; (2) a review of all minute entries to insure the defendant was present at all crucial stages of the proceedings, the jury composition and verdict were correct and the sentence is legal; (3) a review of all pleadings in the record; (4) a review of the jury sheets; and (5) a review of all transcripts to determine if any ruling provides an arguable basis for appeal. Under C.Cr.P. art. 914.1(D) this Court will order that the appeal record be supplemented with pleadings, minute entries and transcripts when the record filed in this Court is not sufficient to perform this review.

While it is not necessary for Defendant's counsel to "catalog tediously every meritless objection made at trial or by way of pre-trial motions with a labored explanation of why the objections all lack merit[,]" counsel's *Anders* brief must "'assure the court that the indigent defendant's constitutional rights have not been violated.'" *State v. Jyles*, 96-2669, p. 2 (La. 12/12/97), 704 So.2d 241, 241 (citing *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308 (1983), and quoting *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429[, 442], 108 S.Ct. 1895[, 1903] (1988)). Counsel must fully discuss and analyze the trial record and consider "whether any ruling made by the trial court, subject to the contemporaneous objection rule, had a significant, adverse impact on shaping the evidence presented to the jury for its consideration." *Jyles*, 704 So.2d at 241 (citing *United States v. Pippen*, 115 F.3d 422 (7th Cir. 1997)). Thus, counsel's *Anders* brief must review the procedural history and the evidence presented at trial and provide "a detailed and reviewable assessment for both the defendant and the appellate court of whether the appeal is worth pursuing in the first place." *State v. Mouton*, 95-981, p. 2 (La. 4/28/95), 653 So.2d 1176, 1177.

Defendant's appellate counsel filed a brief outlining her assessment of the appellate record. We will discuss each of the issues raised in that brief.

## *Sufficiency of the Evidence*

Appellate counsel notes that trial counsel urged that the responsive verdict of forcible rape was applicable since the element of resistance was not established. More specifically, trial counsel argued that the State failed to prove that M.P. resisted the rape to the utmost, but her resistance was overcome by force. Appellate counsel points out that the trial court found M.P. to be credible. She testified that she fought her attacker for a long time and received a broken nose as a result of violent physical force exerted upon her in the attack.

Appellate counsel contends that although M.P. was not certain that penetration occurred, the physical evidence showed otherwise. DNA was found on a vaginal swab taken from M.P., and the nurse who took the swab indicated the unlikelihood of bodily fluids getting so deep within a vagina if not directly deposited there. In addition, the DNA on swabs taken from M.P.'s left hand and vagina exhibited a strong match to Defendant. Finally, the trial court stated that the sketch drawn from M.P.'s description of her perpetrator strongly resembled Defendant.

The analysis for insufficiency of the evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*,

8

436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

In 1999, when the present offense was committed, aggravated rape was defined, in pertinent part, as follows:

> A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
>
> (2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

La.R.S. 14:42.

This court has stated the following regarding the proof necessary for aggravated rape as compared to forcible rape:

> The difference between aggravated rape and forcible rape is the "degree of force employed and the extent to which the victim resists." *State v. Parish,* 405 So.2d 1080, 1087 (La.1981); *State v. Puckett,* 02-997, p. 10 (La.App. 5th Cir.1/28/03), 839 So.2d 226, 231. A greater degree of force is necessary to justify the more serious punishment imposed for aggravated rape. The degree of force employed and the determination of the grade of rape is for the jury to decide. *State v. Cepriano,* 00-213, p. 9 (La.App. 5th Cir.8/29/00), 767 So.2d 893, 899. Nonetheless, the mere fact the defendant was unarmed and the victim suffered no extensive physical pain or injury does not negate the possibility that an aggravated rape occurred.

*State v. Pitts*, 11-1020, p. 7 (La.App. 3 Cir. 4/4/12), 87 So.3d 306, 313 (some citations omitted), *writ denied*, 12-980 (La. 10/26/12), 99 So.3d 639 (quoting *State*

9

*v. Berniard,* 03-484, p. 10 (La.App. 5 Cir. 10/15/03), 860 So.2d 66, 73, *writ denied,* 03-3210 (La. 3/26/04), 871 So.2d 345).

In *State v. Price*, 40,408, pp. 8-10 (La.App. 2 Cir. 12/16/05), 917 So.2d 1201, 1207 (quoting *State v. Stevens*, 33,700, pp. 8-9 (La.App.2d Cir.8/23/00), 766 So.2d 634, 640), *writ denied*, 06-156 (La. 6/16/06), 929 So.2d 1284, the second circuit discussed the difference between aggravated and forcible rape, noting:

> [T]here is no essential difference between the specific results required by each crime definition.  Both require that the victim be prevented from resisting the act by threat of great harm under circumstances where the victim reasonably believes that resistance would be futile.  Forcible rape is merely a lesser degree of the crime of aggravated rape and is a responsive verdict to that crime.  The only distinction between aggravated and forcible rape is the degree of force employed and the extent to which the victim resists.  However, the [fact finder] is authorized to subject a guilty defendant to more severe punishment by convicting him of aggravated rape rather than forcible rape.
>
> . . . .
>
> In this case, the evidence of record clearly supports the jury's determination that when the defendant forced S.C. to perform oral sex on him, she was prevented from resisting the act by threats of great and immediate bodily harm, accompanied by the defendant's apparent power to execute the threats.  S.C. testified that when she attempted to escape, the defendant picked her up and slammed her to the floor.  He then dragged her into the restroom where he threatened to "snap" her neck.  As such, the defendant's actions were clearly tantamount to threats of placing S.C. in fear of great bodily harm.  Had S.C. further resisted the defendant, she had every reason to believe that he would continue to physically abuse her.  In addition, the defendant was physically much larger than S.C.  For these reasons, we find that the evidence before the jury was sufficient to convict the defendant of aggravated rape.  Consequently, the trial court did not err in denying the defendant's motion for post-verdict judgment of acquittal.

See also *State v. Davis*, 09-1061 (La.App. 3 Cir. 4/7/10), 36 So.3d 351, *writ denied*, 11-1908 (La. 4/27/12), 86 So.3d 623, where this court found the victim's resistance was sufficient to satisfy the element of aggravated rape when the

defendant repeatedly hit the victim in the head and dragged her between rooms while striking her.

In *State v. Parish*, 405 So.2d 1080 (La.1981), on rehearing, the supreme court found the verdict of attempted aggravated rape was not supported by the evidence. The defendant gained entry into the victim's home under false pretenses, grabbed her by the throat, clasped her mouth, told her he wanted to make love, threatened to kill her if she screamed, and dragged her toward a bedroom. The defendant outweighed the victim by approximately 130 pounds and was almost a foot taller than the victim. For unknown reasons, the defendant discontinued his actions, apologized to the victim, and left. The court concluded:

> The evidence does not constitutionally justify, however, the jury's election to return a verdict of aggravated rape rather than forcible rape. Within the range of attempted coercive sexual acts, the offense in this case clearly falls among those involving a minimal use of force. Although the victim was frightened and perhaps disturbed psychologically, she was released substantially unharmed. The defendant abandoned his attempt for no reason other than a change of mind. He did not fondle the victim or subject her to any sexual indignity. The evidence viewed from the perspective most favorable to the prosecution does not support a finding beyond a reasonable doubt that the degree of force employed warrants punishment in the greater degree as attempted aggravated rape, rather than in the lesser degree as attempted forcible rape.

*Id.* at 1087 (footnote omitted).

Unlike in *Parish*, Defendant herein did not release the victim unharmed or discontinue his actions before raping her. M.P. was overcome by Defendant from behind when Defendant put his hand over her mouth and arm on her throat. M.P. tried to free herself from Defendant by biting him. When she bit Defendant, he hit her and caused her to fall and hit her head between the wall and the toilet. Defendant then grabbed M.P.'s legs, took her pants off, grabbed her by the hair, and threw her over the toilet. M.P.'s nose was broken and had to be stitched, set with a stint, and eventually corrected by surgery. Considering the foregoing, we

11

find that the evidence presented at trial was sufficient to prove that M.P. resisted to the utmost, but her resistance was overcome by force.

With regard to penetration, we conclude that M.P.'s initial uncertainty about whether she had been raped was understandable given the beating she received and the shock and embarrassment that she was suffering at that time. On the other hand, the DNA expert determined that there was "a very strong match" between Defendant's DNA and the DNA found on the swabs taken from M.P.'s vagina and left hand. Moreover, the nurse who examined M.P. at the hospital explained the improbability of DNA from ejaculation outside of the vagina working its way into where she swabbed deep within M.P.'s vagina. Coupling the DNA evidence linking Defendant to the offense, we conclude that the evidence was sufficient to prove penetration and Defendant's identity as the perpetrator.

*Waiver of Jury Trial*

Louisiana Code of Criminal Procedure Article 780, titled "Right to waive trial by jury," states, in pertinent part:[3]

> The waiver shall be by written motion filed in the district court not later than forty-five days prior to the date the case is set for trial. The motion shall be signed by the defendant and shall also be signed by defendant's counsel unless the defendant has waived his right to counsel.

In the instant case, the motion to waive jury trial was signed by both Defendant and his trial counsel, and it contained a statement that Defendant fully understood his right to a jury trial but waived that right knowingly, voluntarily, and intelligently. The motion was filed prior to the forty-five day cut-off set forth in Article 780. Thus, we find that Defendant validly waived his right to jury trial.

---

[3] This version of La.Code Crim.P. art. 780 was in effect at the time of Defendant's waiver.

12

*Hearsay Objection*

Appellate counsel notes that during trial, defense counsel objected when the State asked Sergeant Derise what M.P. told him about the incident. Defense counsel argued the question called for hearsay. The State responded to the objection by stating, "No. This is the first officer involved in the investigation, Your Honor." When the trial court stated it believed Sergeant Derise was the first reporter, defense counsel responded, "Not the friend she called, Your Honor?" The trial court overruled the objection, noting that what M.P. may have told her friends did not rise "to the level of [] a detailed report." Defense counsel objected to the ruling.

Appellate counsel contends that even if the trial court erred in admitting Sergeant Derise's testimony about what the victim told him, the error would be harmless. Thus, appellate counsel asserts there is no appealable error in the trial court's overruling of trial counsel's hearsay objection.

Louisiana Code of Evidence Article 801(D)(1)(d) provides, in pertinent part:

> **D. Statements which are not hearsay.** A statement is not hearsay if:
>
> **(1) Prior statement by witness.** The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
>
> . . . .
>
> (d) Consistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior.

Use of inadmissible hearsay is subject to the harmless error analysis. *State v. Chapman,* 96-152 (La.App. 3 Cir. 10/9/96), 683 So.2d 1236, *writ denied,* 97-583 (La. 9/5/97), 700 So.2d 505. The standard for harmless error is "whether the verdict was surely unattributable to the error." *Id.* at 1244.

At trial, defense counsel objected to Sergeant Derise's testimony based on the fact that the victim first called her friend. Thus, defense counsel asserted that the victim's initial complaint was made to her friend, not Sergeant Derise. Two of the victim's friends testified at trial, and defense counsel did not specify which friend was the friend to whom the victim initially reported. Our appreciation of the trial testimony is that Sergeant Derise was the first person to whom the victim reported the details of her attack. Even if Ms. Katchur heard from the victim before the victim gave a statement to Sergeant Derise, Ms. Katchur apparently heard only generalities. Additionally, although the victim apparently left a phone message for Ms. Maddox prior to giving her statement to Sergeant Derise, the message reported only generalities.

Even if, however, Sergeant Derise was not the first person to whom the victim reported and his testimony was inadmissible, we find the error to be harmless. In this case, the victim's testimony alone established the element of resistance needed for aggravated rape. Additionally, Defendant's identity was established through DNA evidence. Finally, the element of penetration was also established through the victim's testimony, the SANE's nurse's testimony, and the DNA evidence. If anything, Sergeant Derise's testimony regarding penetration favored the defense since Sergeant Derise testified that the victim did not remember if she was penetrated. For these reasons, we conclude that the admission of Sergeant Derise's testimony, even if erroneous, was harmless.

*Motion to Recuse*

Appellate counsel notes that on July 19, 2016, Defendant filed a pro-se Motion to Recuse Attorney. The grounds for recusal listed in the motion were that Defendant's attorney was pushing for a life sentence, had refused any plea deals, had refused to talk to Defendant, and had lied to Defendant. The trial court denied

14

the motion, stating that the allegations in the motion did not require recusal of Defendant's court-appointed attorney. Appellate counsel asserts that the record does not support the allegations made in the motion and that Defendant went to trial in 2017 with his appointed counsel with no further objection.

Because there is no procedure for recusing defense counsel, we will analyze Defendant's motion as we would a motion seeking the appointment of new counsel. The fifth circuit has stated the following regarding a defendant's right to new appointed counsel:

> The Sixth Amendment to the United States Constitution and Louisiana Constitution Article 1, § 13 guarantee that in all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his defense. If a defendant is indigent, he has the right to court-appointed counsel. *State v. Reeves,* 06-2419 (La.5/5/09), 11 So.3d 1031, 1057, *cert. denied,* —— U.S. ——, 130 S.Ct. 637, 175 L.Ed.2d 490 (2009). The right of a defendant to counsel of his choice has been implemented by La.C.Cr.P. art. 515, which provides in pertinent part that, "Assignment of counsel shall not deprive the defendant of the right to engage other counsel at any stage of the proceedings in substitution of counsel assigned by the court." However, an indigent defendant does not have the right to have a particular attorney appointed to represent him. An indigent's right to choose his counsel only extends to allowing the accused to retain the attorney of his choice if he can manage to do so, but that right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice. *Reeves,* 11 So.3d at 1057.

> The question of withdrawal or substitution of counsel largely rests within the discretion of the trial judge, and his ruling will not be disturbed in the absence of a clear showing of an abuse of discretion. *See State v. Leger,* 05-0011 (La.7/10/06), 936 So.2d 108, 142, *cert. denied,* 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).

> . . . .

> In the absence of an adequate showing that the court appointed attorney is inept or incompetent to represent the accused, the court cannot be called upon to appoint counsel other than the one originally appointed merely to please the desires of the indigent accused.

*State v. Gorman*, 11-491, pp. 11-14 (La.App. 5 Cir. 2/14/12), 88 So.3d 590, 598-99.

The record in the present case does not show that Defendant's court-appointed counsel was inept or incompetent to represent him. Defendant's attorney filed pre-trial motions, made objections at trial, and cross-examined witnesses. Thus, we find the trial court did not abuse its discretion in refusing to appoint Defendant another attorney.

*This Court's Review of the Record*

Pursuant to *Anders* and *Benjamin*, this court has performed a thorough review of the record, including the pleadings, the minute entries, the charging instrument, and the transcripts. Defendant was present and represented by counsel at all crucial stages of the proceedings. The verdict was correct, and Defendant received a mandatory life sentence without benefit of probation, parole, or suspension of sentence. In reviewing the transcripts to determine if any other ruling provides an arguable basis for appeal, we note that defense counsel made several objections, most of which were discussed in appellate counsel's brief. Our review of the record reveals no issues that would support an assignment of error on appeal beyond the potential issues raised by counsel and addressed in this appeal. Therefore, we grant appellate counsel's motion to withdraw.

**CONVICTION AND SENTENCE AFFIRMED. MOTION TO WITHDRAW GRANTED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.